UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PAMELA WOLOSKY, | ) | Civil Division |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | **Electronic Filing** |
| | ) | |
| TRINITY AREA SCHOOL DISTRICT, | ) | |
| | ) | |
| PAUL KASUNICH, and AMY MCTIGHE, | ) | |
| | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| Defendants | ) | |

## COMPLAINT

## I. NATURE OF THE ACTION

1.      This is a civil action to correct unlawful employment practices, and to make whole the

Plaintiff, Pamela Wolosky, under Title VII of the Civil Rights Act of 1964 (TitleVII), the Age

Discrimination in Employment Act (ADEA), and the Pennsylvania Human Relations Act (PHRA),

all as amended, which prohibit discrimination and retaliation against any individual by an employer,

respectively, on the basis of the individual's sex, age, and protected activity under the statutes.  Dr.

Wolosky was denied the raise she had earned in 2011, subjected to a pattern of discriminatory and

retaliatory abuse, ridicule, insult, and surveillance which created a hostile work environment, and

given a formal Unsatisfactory performance rating and denied a raise in 2012, after which she was

forced to use sick leave and take a sabbatical to escape the unabated abuse by the Superintendent.

## II. PARTIES

2.      Plaintiff, Pamela Wolosky ("Plaintiff" or "Dr. Wolosky"), is a 58  year-old female resident of Washington County, Pennsylvania, and  a highly-experienced, professional Special Education administrator, currently employed as the Director of the Department of Special Education at Trinity Area School District.

3.      Dr. Wolosky earned her M.Ed in Special Education and her doctorate in Pedagogy and Motor Development. She holds an additional M.S. in Exercise Physiology. Before joining the Trinity Area School district in 2005 as Director of Special Education, she worked for the Intermediate Unit (IU1) for nearly twenty (20) years as a special education teacher, teaching Adapted Physical Education, another  three (3) years as Lead Support Teacher, plus three (3) summers as an Early Intervention Classroom Teacher, and five (5) years as the Special Education Program Supervisor.

4.      In addition, Dr. Wolosky taught part-time at the college level, teaching Special Education for three (3) years and Motor Development and Childhood Development: Early Childhood-Adolescence, for three (3) years. She holds a Supervisory II (permanent) certificate in Special Education as well as Instructional II certificates in Special Education, Elementary Education, Early Childhood Education, Health, and Physical Education.

5.      Dr. Wolosky not only supervised Trinity's 2007 and 2012 Pennsylvania Department of Education (PDE) Bureau of Special Education Cyclical Monitoring for Continuous Improvement audit ("CMCI" or "compliance monitoring"), but during her five years as the Special Education

Program Supervisor at the IU1, Dr. Wolosky actively and extensively worked with around eight (8) other Districts to prepare them for compliance monitoring.

6.    Defendant Trinity Area School District, ("Defendant," "TASD," "Trinity," or, "the District") is a school district having its central office located in Washington County Pennsylvania, and is an employer of more than 500 persons, and is represented by Attorney John Smart and the law firm of Andrews & Price.

7.    At all times relevant to the claims asserted herein, Trinity has continuously been a person and an employer within the meaning of 42 U.S.C. § 2000e, 29 U.S.C.§621(b),  and 43 P.S. § 954(a) and (b).

8.    Defendant Paul Kasunich ("Dr. Kasunich" or "Kasunich") is an individual and a person specifically named in the administrative Charge and Complaint, as a person and employe within the meaning of 43 P.S. §§954(a) and 955(d)(retaliation) and (e)(aiding and abetting), who is represented by Attorney John Smart and the law firm of  Andrews & Price, who was personally served with the EEOC Charge/PHRC Complaint on May 3, 2011.

9.    Dr. Kasunich is employed as the Superintendent of Trinity, but has no experience as a Special Education teacher or administrator, and extremely limited educational administrative experience.

10.    Defendant Amy McTighe ("McTighe") is an individual and a person specifically named in

the administrative Charge and Complaint as a person and employe within the meaning of 43 P.S. §§954(a) and 955 (e)(aiding and abetting), who was served with the EEOC Charge/PHRC Complaint through her counsel, Attorney John Smart and the law firm of Andrews & Price.

11.     According to her resume in 2012, McTighe allegedly earned an online doctorate in Philosophy in 2010, and her work experience was limited to nine years as a Life Skills teacher, two years as an Autistic Support teacher, and three years as a part-time instructor at Pitt.

12.     When Dr. Kasunich hand-picked McTighe and effectively made her the Director of the Special Education Department at Trinity, effective January 2012, she had no supervisory certificate and no supervisory or administrative experience whatsoever, and was utterly without any knowledge or experience in numerous areas of Special Education law and practice; from her first day on the job, at Dr. Kasunich's direction, she maintained a written surveillance log on Dr. Wolosky, and she regularly met privately with Dr. Kasunich to assist him in criticizing and abusing Dr. Wolosky to try to force her to quit.

13.     McTighe's resume  reported that when she was employed as a Life Skills teacher at the Hampton Area School District, she was an, **"Active participate [sic] in the State of Pennsylvania Cyclical Monitoring Process and Educational benefit review (2011)."** (Emphasis in original)

### III. JURISDICTION AND VENUE

14.    Original federal question jurisdiction over this private suit to enforce civil rights, is conferred on this court by 42 U.S.C. §2000e-5, 28 U.S.C.§ 626, and 28 U.S.C. §§ 1331. Supplemental jurisdiction over the related state law claims under 43 P.S. § 951 et seq.,  is conferred by 28 U.S.C. §§ 1367(a).

15.    Venue is properly laid in the U.S. District Court for the Western District of Pennsylvania pursuant to 28 U.S.C. 1391(b), and in the Pittsburgh Division, pursuant to W.D.PA. L.R. 3.1., because the unlawful employment practices occurred in and around Washington County, and Allegheny County,  Pennsylvania, where all parties reside, where Dr. Wolosky works, and where Plaintiff suffered the unlawful employment practices and the resultant damages.

### IV. CLAIMS

16.    Defendant Kasunich began working for Trinity as Superintendent in April, 2010.

17.    As Director of Special Education, Dr. Wolosky reported directly to Dr. Kasunich.

18.    Dr. Kasunich belittled, threatened, and falsely criticized Dr. Wolosky regarding her job performance.

19.    Defendant Kasunich displayed similar threatening and harassing behaviors toward Mrs.

Yvonne Weaver, Dr. Beth Tully, and Dr. Wolosky, all strong, accomplished female administrators over age forty who did not conform to the female sex stereotype of submissive or subservient.

20.     Dr. Kasunich gave the young submissive women he hired, Transition Coordinator Ms. Atkinson and Defendant McTighe, both under age 40, permission to work at home, although no other administrator or staff person was permitted to do so.

21.     Defendant Kasunich was arrested on November 23, 2010, for simple assault of his girlfriend, a strong, accomplished professional school administrator over age forty.  The Northern Regional Police Department in Pine reported that they saw marks and bruises on his girlfriend's back and neck, "from where [Kasunich] threw her through a wall," and noted that her shirt was torn "and almost completely ripped off her body."

22.     This abusive conduct was consistent with that described in his girlfriend's sworn statement in her January 2, 2009 petition for Protection from Abuse, that he threw her into a wall, threw her into a closet twice, threw her to the floor, and threatened to kill her.

23.     These reports and records were publicly available, disseminated, and widely discussed in the Trinity and Washington County communities.

24.     In a November 25, 2010 article in the Pittsburgh Post-Gazette, a parent of three TASD students (and current TASD School Board member), Ms. Kerrin McIlvaine said she feared for her

children and other district employees. "It's such a personal affront to women everywhere that he's still walking around our building."

25.     Dr. Kasunich was briefly suspended with pay, but was reinstated as Superintendent in December 2010.

26.     The Pennsylvania Auditor General conducted an audit of Trinity Area School District and issued its report in January 2011, concluding, "TASD complied, in all significant respect, with applicable state laws, regulations, contracts, grant requirements, and administrative procedures." The audit  "resulted in no findings or observations."

27.     During the 2010-2011 School Year, then -Assistant Superintendent, Dr. Yvonne Weaver, a strong, older professional female administrator, often came to Dr. Wolosky's office for respite, to escape Defendant Kasunich's harassment and pressure to force her to quit or "retire."

28.     Dr. Weaver was a life-long Trinity community member, first as a student and then as an employee, serving in increasingly advanced roles for the District, until she could not take Kasunich's abusive treatment any longer, and she resigned at the end of the 2010-2011 year.

29.     Dr. Wolosky observed Kasunuch's pattern of isolating Dr. Weaver from her peers and subordinates, removing Dr. Weaver's responsibilities, and humiliating her.

30.    Defendant Kasunich reported to others that Dr. Weaver had "retired," though she began working as an administrator at Waynesburg University.

31.    Defendant Kasunich next set his sights on removing the other two strong, older female administrators, Dr. Wolosky and Dr. Beth Tully.

32.    In Spring of 2011, the District offered a financial incentive for its senior employees to retire, which was available until Spring 2012.

33.    Dr. Kasunich met with Dr. Wolosky and tried to pressure her into retiring, and, for the first time, added the insinuation that her performance was, in some unspecified way, poor or declining.

34.    Dr. Wolosky informed Dr. Kasunich that she had no intention of retiring.

35.    Thereafter, whenever Dr. Kasunich told Dr. Wolosky he wanted her to retire, and she always told him that she would not.

36.    Dr. Wolosky's performance was initially only vaguely criticized for the first time in her career, in connection with Dr. Kasunich's directive that she retire; her steadfast refusal to accede to these discriminatory threats resulted in an escalation of abuse towards her, including a physical invasion of her personal space, threat to "get her" and threats to fire her, culminating in her first Unsatisfactory rating and zero raise ever.

37.     Dr. Kasunich methodically and actively began to interfere directly in Dr. Wolosky's supervision of the Special Education Department, to undermine her authority and to sabotage her work, to harass and humiliate her, to intimidate her, and to try to make her appear to have a performance deficiencies, all of which created a hostile work environment because of her sex and age, and in retaliation for having opposed his discriminatory treatment of her on the basis of her sex and age. The examples set forth in this complaint are merely illustrative and not exhaustive of the instances of the harassment Dr. Wolosky was made to suffer as a term or condition of employment.

38.     Dr. Kasunich regularly addressed Dr. Wolosky in a rude and intimidating fashion that he does not regularly use with men or with women who conform to the submissive female sex stereotype.

39.     Dr. Kasunich's words and actions towards Dr. Wolosky were deliberately offensive, intimidating, and threatening.

40.     Dr. Kasunich's discriminatory actions towards Dr. Wolosky concerning her performance reviews, goal setting, and raises and bonuses in violation of the statutes also violated the District's own written policies: the Act 93 Agreement, the Administrator Compensation Plan, and Trinity Policy No. 313, Evaluation of Administrative Employees.

41.     The District is required to meet with administrators to set goals at the beginning of the school year for a specific purpose: the goals are the sole measure of the administrator's performance and entitlement to a raise at the end of the school year.

42.    Dr. Wolosky was not provided with her performance goals for SY 2011-2012, though the

District provided them to other administrators.


43.    It was a violation of the Agreement between the District and its administrative employees

under Act 93 for the District not to comply with the requirement of providing her with her goals at

the beginning of the school year.[1]


44.    The designated ASLLC Evaluation Forms require, for each goal, that the specific objective

---

[1] The Act 93 Evaluation Plan for Trinity Area Administrative Team provides, in
pertinent part:

Expectations
Each administrator will have four goals to work on during the course of the year.
Goals must be correlated with appropriate ISLLC Standard(s). Progress will be
reviewed quarterly to assess incremental movement toward each goal and address
concerns.

Meeting 1: August
Meeting 2: November
Meeting 3: March
Meeting 4: June

Goals
All administrators will have four goals:
Goal 1: Academic district goal
Goal 2: Building level goal
Goal 3: Innovation/Research goal
Goal 4: Final goal will be developed by Superintendent in consultation with
administrator.

Rating System
Each goal will be outlined in ISLLC Evaluation Form. The supervisor rating will
have a numerical value assigned to each rating.

be identified and that the measure of success be identified (i.e., what outcome will indicate that the goal has been achieved).

45.     The TASD Administrator Evaluation Goal Setting and Professional Rating forms assign points for each goal as follows: Rudimentary: 0; Emerging: 10; Proficient: 15; Accomplished: 20. The agreement provides a range from 0 raise for a goal-achievement score below 40 points, to a 5% raise (and $1,000.00 bonus) for a score of 80 points.

46.     The Trinity Administrator Compensation Plan provides, in pertinent part, and in mandatory language, "The Board will annually set the salaries of each Administrator based on the Administrator's annual evaluation...The Superintendent shall conduct annual performance evaluations of each Administrator."

47.     Trinity Policy No. 313, Evaluation of Administrative Employees, provides, in pertinent part, and in mandatory language,

"The Board directs that evaluations of administrative employees be performed at least annually....Prior to the beginning of the period under evaluation, the Superintendent or designee *shall* discuss with the administrative employee the criteria to be used for evaluation purposes...Each observation *shall* be followed by a conference between the evaluator and the administrative employee. Both parties to the conference *shall* sign the evaluation report and retain a copy for their records. Following the conference, the employee *shall* have the right

11

to submit a written disclaimer of the evaluation; the disclaimer *shall* be attached to the report." (Emphasis added in all cases).

48.    The overall rating for administrators can only be either "Satisfactory" or "Unsatisfactory."

49.    On September 8, 2011, Dr. Wolosky met with Dr. Kasunich.

50.    At this meeting, Dr. Kasunich did not review Dr. Wolosky's performance to goals for 2010-2011.

51.    Dr. Kasunich did not state that Dr. Wolosky's performance had been rated Unsatisfactory, either overall, or in any single area.

52.    Dr. Kasunich did not mention how Dr. Wolosky's performance was evaluated in relation to the rubric, as outlined in the Act 93 Agreement.

53.    Dr. Kasunich did not mention the imposition or planned imposition of a performance improvement plan ("PIP") at this time, nor was any written indication of Dr. Wolosky's performance provided.

54.    Dr. Kasunich said that Dr. Fair from KECG and then-District Solicitor Dennis Makel were committing to writing, how disorganized the Special Education Office was.

55.    Dr. Kasunich stated that "Dr. Fair's girlfriend," Dr. Susan Wiegand, is a Director of Special Education at Riverside School District and that he wanted her to come and review the operations of Dr. Wolosky's office.

56.    Dr. Kasunich revisited their conversation from the previous school year, when Dr. Kasunich suggested that Dr. Wolosky retire and said she was not performing her job.

57.    Dr. Wolosky told him that last year, she had told him that she was fully capable of doing the job, and that she works about 10 hours a day. She asked Dr. Kasunich if he remembered the conversation and what he said. Dr. Kasunich said, **"Yes, yes, you need to work more."**

58.    Dr. Wolosky advised Dr. Kasunich that she needed professional assistance in the Department, and explained that other districts such as Canon MacMillan and McGuffey have both a Transition Coordinator and a Lead Support Teacher.

59.    Dr. Kasunich exploded, **"You aren't there! Do you want to go there?"**  Dr. Wolosky replied "No.  I am here and I want to stay here."

60.    Dr. Wolosky said she lives within the Trinity School District and didn't want to work anywhere else.

61.    Dr. Kasunich replied, **"I don't care where you live.  You will need to improve 100%."**

13

After a pause with no discussion, Dr. Kasunich said, **"I'm trying not to yell."**

62.    Despite this assertion by Dr. Kasunich in early September, that Dr. Wolosky had to improve "100%," he had rated Dr. Wolosky's performance Satisfactory after the 2010-2011 school year, as she had been rated in every prior year.

63.    Defendant Kasunich never informed Dr. Wolosky of any deficiencies in her progress towards achieving any of her goals, at any time during the 2010-2011 school year.

64.    Dr. Wolosky was entitled to a 5% raise and $1,000.00 bonus, because she had demonstrably successfully completed all of her 2010-2011 Goals.

65.    The District's then-Business Director, James Shargotts, subsequently informed Dr. Wolosky that she had received only a 2% raise, and no bonus.

66.    All Administrators except Dr. Wolosky at least had a discussion with Dr. Kasunich regarding their attainment of goals for SY 2010-2011 and their raises.

67.    Despite her explicit requests, Dr. Wolosky was never told and was never given documentation describing which of her goals she met and which she allegedly did not, in order to justify denying her the full 5% raise and $1,000.00 bonus to which she was entitled under the terms of the District's Act 93 agreement.

14

68.     One of the several ways Dr. Kasunich sought to fabricate a false record of a performance deficiency against Dr. Wolosky was by paying the Keystone Education Consulting Group (KECG) to visit the District, ostensibly to provide training, and to help prepare for the state's Cyclical Monitoring audit.

69.     Dr. Kasunich also authorized the expenditure of thousands of dollars in District funds to pay KECG to generate a report criticizing the functioning of the Special Education Department, in order to shore up his prior baseless criticism of Dr. Wolosky.

70.     During trainings in the Summer of 2011, KECG actively solicited complaints from Dr. Wolosky's subordinates about the Special Education Department, and KECG provided instructions at its trainings which directed the TASD Special Education staffers to complete IEP file documents incorrectly.

71.     No fewer than six teachers independently came to Dr. Wolosky and reported, for example, that it seemed like KECG was "on a witch-hunt" against Dr. Wolosky.

72.     The KECG training contained information that was inaccurate and not consistent with then-current regulations for Special Education.

73.     The training that Kasunich paid KECG to provide could have been provided at no cost to the District by the Intermediate Unit ("IU1").

74.     Another example of Defendant Kasunich's attempt to intimidate, and embarrass Dr. Wolosky, and to attempt to create a false record of a performance deficiency, occurred on September 16, 2011.

75.     In an email copied to Dr. Kasunich, an elementary special education teacher asked Dr. Wolosky for "restraint training" so that she would be able to handle situations as they occur in her emotional support classroom.

76.     There was no reason for the Superintendent to get involved in this exchange, due his to ignorance of Special Education protocol.

77.     Dr. Kasunich intervened and replied, " Pam, I would expect the restraint training be made available ASAP."

78.     Dr. Wolosky could not obey this directive, because *the use of restraints is against the Trinity Area  School District's Policy*, as she duly informed both the Superintendent and the teacher.

79.     On September 26, 2011 Dr. Kasunich asked Dr. Wolosky why a teacher had not received the assistance in writing a Re-evaluation Report ("RR") that she had requested on September 7, 2011.

80.     Dr. Kasunich conducted no investigation, and made no inquiry, before falsely accusing Dr. Wolosky of failing to provide training, based only on the teacher's allegation.

81.     In fact, the allegation was untrue, as Dr. Wolosky and Robyn Willis had both provided the teacher with training.

82.     On September 26, 2011, without explanation, Dr. Kasunich questioned Dr. Wolosky about the appropriateness of an IEP which included bathing as a goal.

83.     Dr. Wolosky informed Dr. Kasunich that the goal was perfectly appropriate as it was taken directly from the Life Skills Curriculum which the District had purchased and adopted.

84.     On October 5, 2011, Dr. Susan Wiegand, a KECG consultant, visited the District and reviewed some Special Education files and talked with Dr. Wolosky and her staff.

85.     On October 10, 2011, Trinity paid KECG $4,000.00 for "Two consultants [Dr. Merhaut and Dr. Fair] will conduct a two day file review of 20 random [Special Education] files," even though this action was never performed by Dr. Merhaut and Dr. Fair, or by any other KECG contractor.

86.     Dr. Wolosky and her staff did not provide KECG with 20 files to review, and KECG never reported any results of a 20-file review.

87.     In addition, KECG did not provide "Two consultants 2 half days meeting with administration," for which the District paid $2,000.00.

88.     Dr. Wolosky only met with them for approximately one half hour, and then she and the KECG consultants met with the Superintendent and Assistant Superintendent for about another half hour.

89.     On October 11, 2011,  KECG sent the District another invoice for $1,150.00 for the following services rendered by Dr. Wiegand:  Reviewed 15 Special Education files for organization, contents, compliance issues, as per the Superintendent's request, interviewed the Director of Special Education regarding office process for collecting and organizing documents and data, and Reviewed data collected and developed report for Dr. Kasunich.  Edited Report. Finalized (10.10.11) and emailed to Dr. Kasunich.  Mailed hard copy on 10.11.11.

90.     Dr. Kasunich did not provide Dr. Wolosky with a copy of the KECG report at that time, nor did he even inform her that he had received it.

91.     On October 20, 2011, Dr. Wolosky was not informed that School Board member Dennis McWreath had requested an update on Special Education Settlements and pending cases, and Dr. Kasunich did not ask Dr. Wolosky to provide the information necessary to respond accurately to the inquiry.

92.     On October 25, 2011, Dr. Kasunich authorized Trinity to pay KECG an additional $1,150.00 for Dr. Wiegand's review of 15 Special Education files and report.

93.    On October 25, 2011, Dr. Wolosky was called to Dr. Kasunich's office, ostensibly for her first Act 93 Goals Meeting, even though the Act 93 Agreement specifies the first meeting is to be held in August.

94.    As Dr. Wolosky prepared to review potential goals that she developed in preparation for the meeting, Dr. Kasunich stated that he was issuing Dr. Wolosky an unsatisfactory evaluation and that he wanted to go over it with her.

95.    Dr. Kasunich handed Dr. Wolosky a letter dated October 24, 2011 that begins with: "This correspondence is serving as the notification of an unsatisfactory rating issued to you."

96.    The letter further indicated, in pertinent part, that "the following improvement plan will be implemented."

97.    Seven (7) other administrators had received raises of 2% *or lower* for their performance the pervious school year, but none were placed on performance improvement plans.

98.    Dr. Wolosky asked if she could proceed with the discussion of setting her goals for the 2011-2012 school year.  Dr. Kasunich replied that this would not be necessary because Dr. Wolosky had enough to handle with the improvement plan.

99.    Every administrator except Dr. Wolosky had the mandatory Act 93 Agreement goals

meetings and were provided with their mandatory written goals for SY 2011-2012.

100.    Dr. Wolosky's "three month" performance improvement plan ("PIP") consisted of two assignments:  reorganizing the filing system, and continuing to provide training concerning Special Education issues.

101.    Dr. Wolosky completed the two tasks originally assigned on the October PIP.

102.    It was impossible for Dr. Wolosky to "complete" the improvement plan, only because Dr. Kasunich constantly changed and added to the requirements of the plan.

103.    The first PIP task essentially consisted of using the kind of file folders and filing cabinets Dr. Wiegand used in her office, and putting the documents in the file in chronological order (oldest on top) instead of the reverse chronological order (most recent on top) that Trinity had been using without incident for years.

104.    The second task on the PIP was to "develop and deliver monthly professional development for special education teachers and administrators serving as LEAs" on eight specified topics, including one, "Create practice of issuing a NOREP/PWN after each annual IEP," which was an incorrect procedure that wasted time creating unnecessary paperwork.

105.    Well before she was placed on a PIP, Dr. Wolosky prepared and distributed Monthly Administrator Reports which detailed her activities, including the regular meeting and training of

teachers, staff and parents, and her own attendance at trainings concerning Special Education compliance.

106.    Defendant Kasunich acknowledged that Dr. Wolosky had successfully completed the second PIP assignment when she submitted a seven-page list of completed and planned trainings as of November 8, 2011.

107.    In order to continue to criticize Dr. Wolosky and to assign additional time-wasting tasks, Dr. Kasunich subsequently demanded that Dr. Wolosky submit documentation of the trainings, and then, demanded that she create new documentation ("minutes") that was not even used in the trainings.

108.    On October 26, 2011, Dr. Wolosky reviewed Dr. Kasunich's directive to implement the filing procedure used and recommended by Dr. Wiegand, which required the purchase of specific new folders/binders and new filing cabinets.  Dr. Wolosky and the secretaries discussed the high cost of this endeavor.  Dr. Kasunich said to provide him with "the cost for materials and I will confirm order."  Dr. Kasunich directed the use of ACCESS funds to cover the substantial cost of this reorganization.

109.    On October 28, 2011, Dr. Kasunich sent an email to all Act 93 members *except Dr. Wolosky*, requesting that all administrators submit their 2011-2012 goals to him no later then Monday, October 31st.

110.    On October 31, 2011, a Special Education teacher provided Dr. Wolosky with a list of four items that the KECG training had inaccurately presented.  Other Special Education teachers agreed that the list correctly described the incorrect instruction provided by KECG.

111.    By November 2, 2011, Dr. Kasunich had received the written report from KECG that was submitted by Dr. Joe Merhaut and which attached and incorporated the October 11 summary of Susan Wiegand's visit, observations, and suggestions.

112.    Dr. Wolosky requested that Dr. Kasunich provide her with a copy of the report provided by KECG and he finally gave it to her.  The report included the following disclaimer, "I realize that these findings appear to be negative however most of the problems found can be fixed....Many of the problems we found are considered harmless error which means students will not be hurt in any way by the error."

113.    Dr. Wolosky also noted the KECG report contained errors concerning Special Education compliance, which were mirrored in Dr. Kasunich's Unsatisfactory rating/PIP letter, and she discussed these errors, but not the source, with Special Education colleagues from other Districts, including one who also works as a consultant for KECG.

114.    On November 7, 2011, Dr. Wolosky submitted to Dr. Kasunich a letter which rebutted the falsehoods contained in his October 24 "Unsatisfactory rating" letter and PIP, specifically challenged the action as "**unfair**" "**unwarranted**" "**disingenuous**" and "**bias[ed]**," [sic] and requested that he

rescind the Unsatisfactory rating.

115.    Dr. Merhaut called Dr. Wolosky to ask whether she had discussed the KECG report and her Unsatisfactory rating/PIP with others at a bar, and she informed him she had not.

116.    On November 8, 2011, Dr. Wolosky took Principal Don Snoke, an Act 93 member, with her to  the meeting with Dr. Kasunich for the monthly improvement plan progress review.  At the conclusion of the meeting, Don Snoke excused himself and Dr. Wolosky proceeded to gather her materials and turned to exit Dr. Kasunich's office.  Before Dr. Wolosky could exit the room Dr. Kasunich physically blocked her path to the door and closed the door.

117.    Dr. Kasunich threatened Dr. Wolosky that if she said anything against KECG that he would make sure that he "gets" her.

118.    Dr. Wolosky was very upset and felt threatened by Dr. Kasunich's behavior and reported Dr. Kasunich's actions to Don Snoke; she refused to meet alone with Dr. Kasunich ever again.

119.    Dr. Kasunich's written summary of the November 8 meeting falsely asserted that no progress was made on the implementation of the filing system as outlined by Susan Wiegand.

120.    At the November 8 meeting, Dr. Wolosky reported that she and her staff had met and discussed the considerable expense of buying new folders, because it would also require buying new filing cabinets, and had developed an alternative  proposal, but Dr. Kasunich rejected it and ordered

23

Dr. Wolosky to copy Dr. Wiegand's filing arrangement.

121.    Dr. Kasunich's memo concerning the November 8 meeting added that all agendas and minutes from the meetings/trainings need to be added to the improvement plan.

122.    On November 11, 2011, Dr. Wolosky received a call from then-school board member Jack Keisling saying that "**he did not like what they were doing to [Dr. Wolosky]**."

123.    Mr. Keisling also contacted Charles F. Mahoney, Executive Director of IU1, and asked him to contact Dr. Wolosky and to provide her with whatever support she needed.

124.    The Hampton Township School District minutes of November 14, 2011 indicate "the resignation of Dr. Amy McTighe, after nine years with the District, effective October 31, 2011.  Dr. McTighe was a Life Skills Teacher at Hampton High School."

125.    On information and belief, McTighe agreed to resign after she was threatened with termination from the Hampton Area School District for gross misconduct including falsification in connection with a Special Education vocational program.

126.    On November 16, 2011, the Intermediate Unit 1 posted a job for Teacher: Lead Support for the Special Education Department at Trinity Area School District.  Deadline to Apply: November 23, 2011.  Start Date:  December 1, 2011.

127.    On November 22, 2011, Dr. Wolosky and her Act 93 Representative Don Snoke met with Dr. Kasunich.  Dr. Kasunich acknowledged that Dr. Wolosky had successfully "developed and implemented Dr. Wiegand's system (and/or "process") for records order, but again added a new requirement to the PIP that Dr. Wolosky update him "weekly" on staff overtime, and said that he wanted to use ACCESS funds for payment for overtime.

128.    Dr. Wolosky had also provided Dr. Kasunich with the training materials which constituted both the agenda and the "minutes" of each training session, but Dr. Kasunich now criticized this as insufficient, and now insisted that she create and submit "minutes" of training sessions, as a new requirement of the PIP.

129.    On November 23, 2011 Dr. Wolosky informed Dr. Kasunich that there were two IU1 candidates available to be interviewed for the Lead Support Teacher position on November 29th or 30th.

130.    On November 29, 2011 at 10:29 a.m., Leigh Dennick, Director of Special Education Services at IU1, emailed Dr. Wolosky inquiring if Dr. Kasunich had discussed the meeting with the IU staff members at the end of the day.  Dr. Wolosky sent an email to Dr. Kasunich regarding meeting the two candidates from the IU1 later in the day.

131.    At 11:06 a.m., Dr. Kasunich emailed Dr Wolosky: "Pam, Joe [Merhaut of KECG] and I have scheduled an interview with Amy McTighe in regards to the Lead support position.  Amy worked

for Hampton for 10 years and was extensively involved in their audit last year. She will be coming in on 12/7/11 at 9:00 a.m. Please make every effort to attend."

132.    No explanation was ever offered or provided for why a non-District employee (Merhaut) was participating in the hiring process.

133.    Based on Dr. Wolosky's experience at Trinity, the standard hiring practice is that the job requirements are posted on TASD's website. The applicants provide the required materials.  Only after reviewing the resume and additional documents, checking for accuracy and compliance, an interview is scheduled with the top candidates.

134.    Previously, TASD required that 3 individuals be interviewed for each position. At the interview, an informational packet was provided to the interviewers that contains all of the materials mandated by TASD.

135.    It has been TASD's policy that individuals who submitted incomplete packets did not receive an interview.

136.    During Defendant McTighe's hiring process, none of these standard procedures were followed.

137.    No reference check with Defendant McTighe's previous employer, the Hampton Township

School District, was conducted, despite the public knowledge that Defendant McTighe had abruptly resigned from a tenure track position with Hampton just two months into the school year.

138.   Defendant McTighe reportedly earned her doctorate from an online university while employed at Hampton, though on information and belief, she did not actually complete the requirements for the online doctorate degree; a news report in the Pittsburgh Post-Gazette in December 2013 no longer used the honorific, but referred to her only as "teacher Amy McTighe."

139.   On December 7, 2011, Dr. Kasunich, Dr. Merhaut, and Dr. Wolosky interviewed only one candidate, Amy McTighe, for the position of Lead Support Teacher; no formal interview was conducted, such as scripted questions and responses, thus no scoring occurred.

140.   Defendant McTighe brought nothing to the interview with her.  No clearances were provided and no packet was provided to the interviewers regarding the candidate.  Defendant Kasunich asked whether she had brought her resume to the interview. She said no. Dr. Kasunich said that was OK, and that he would get it later.

141.   During the "interview," Dr. Merhaut announced that she is the best candidate for the position and that he would say that, "even if [McTighe] was not related to [him]."  He also said, "She did it all" at Hampton, referring to the compliance monitoring, which Hampton had completed the previous school year. Dr. Merhaut also mentioned that McTighe was a student at Hampton when he was a principal there.

27

142.    Shortly after the "interview," Defendant Kasunich entered the Special Education Office and asked Dr. Wolosky what she thought about McTighe.  Dr. Wolosky replied that she appeared "nice" but that she did not know much about her and her experiences related to Special Education.  Dr. Kasunich replied that is ok, "She is your new Lead Support Teacher."

143.    The District contends the reason the two IU candidates were not interviewed is that they withdrew from consideration.

144.    Dr. Wolosky called the IU and relayed the message to Leigh Dennick. They discussed the fact that since Dr. Kasunich had already made his decision to hire McTighe, it would be useless to schedule any interviews with the IU candidates, especially since he had never returned any of their calls regarding hiring a Lead Support Teacher.

145.    The position was supposed to have been filled by December 1, 2011, which would have been possible if IU1 services were contracted, or a TASD teacher was appointed to the position for the remainder of the school year.

146.    McTighe's projected start date was January 23, 2012, two months after the posting was placed.  This delay cost the Special Education Department valuable time to prepare for the compliance monitoring and ignored highly qualified candidates within the TASD bargaining unit and at IU 1.

147.    Dr. Kasunich, Dr. Wolosky, and her Act 93 representative, Don Snoke, next met on December 14, 2011.  Dr. Kasunich acknowledged the new filing system was in place and that all of his requirements concerning scheduling and conducting trainings were met. Nonetheless, he did not advise Dr. Wolosky that she had successfully completed the PIP.  Instead, he added more new assignments to the PIP.

148.    On January 11, 2012, Dr. Kasunich verbally rebuked Dr. Wolosky for informing relevant District staff in December 2011 of staff reassignments to be effective in the January 2012 term.

149.    At the January 13, 2012 improvement plan meeting, Dr. Wolosky reported that the refiling of the records in the new filing system is approximately one quarter completed and Dr. Kasunich pressed for an expected date for completion.

150.    Dr. Wolosky stated that she had never undertaken such a huge task, *especially in the midst of a cycle of compliance monitoring*, but set a date of March 3, 2012 as her goal.

151.    On January 19, 2012, the Trinity School Board voted to approve the contract with McTighe as the Special Education Lead Support Teacher for the period January 23, 2012 through June 22, 2012.

152.    On January 23, 2012, the TASD teachers' association filled a grievance over the hiring of McTighe, asserting the improper filling of vacancies.

29

153.    On January 24, 2012 the District sent a letter to McTighe stating that she was approved not as the Special Education Lead Support Teacher, but as an Assistant to the Director of Special Education.

154.    On January 25, 2012, McTighe provided the Re-evaluation Report (RR) team at Trinity East Elementary with incorrect information concerning completion of a form; she was informed that what she was telling them to do was wrong, but refused to permit them to complete the form correctly.

155.    Dr. Wolosky was informed by a Special Education teacher, that McTighe had told a Special Education teacher that Dr. Kasunich had asked McTighe to come up with four or five items that need to be improved within the Special Education Department, and McTighe asked him for suggestions.

156.    On February 6, 2012, Dr. Wolosky met with Dr. Kasunich and McTighe regarding identifying McTighe's duties because the staff was confused by the directives McTighe was issuing, which were contrary to the training and directives Dr. Wolosky gave them.

157.    At the end of the meeting, McTighe left Dr. Kasunich's office, briefly leaving Dr. Kasunich and Dr. Wolosky remaining in his office.

158.    As Dr. Wolosky got up to leave, Dr. Kasunich again told Dr. Wolosky that he had concerns about her doing this job, and that she needed to look into the retirement option.

159.     Dr. Wolosky responded that she would need to discuss it with her husband.  Dr. Kasunich became animated and tried to pressure Dr. Wolosky into agreeing to retire, demanding, why did she need to talk to her husband about it?  Dr. Kasunich said that he is not being "mean," but that she should consider retiring.

160.     Also on February 6, 2012, Dr. Wolosky copied Dr. Kasunich on a group email she sent regarding a high profile case, in order to keep all administrators involved, including the High School Principal, aware of what was transpiring and seeking the correct outcome for all.

161.     Dr. Kasunich replied only with unwarranted criticism, "**I would hope that as Director of Special Education you would be able to communicate directly with the High School Principal to ascertain the facts**."

162.     On February 8, 2012,  Dr. Kasunich responded in rude and condescending fashion to Dr. Wolosky's request for guidance concerning the content of the email he wanted her to send, introducing Dr. McTighe to the District, **"It would seem to me you would be able to develop such an introductory email on your own and I will review nefore [sic] sending. I would expect in your position and with your experience you would be able to draft such an email without me doing it for you."**

163.     Dr. Wolosky replied, explaining that she did not have any information regarding Dr. McTighe such as her educational and professional experience, since McTighe did not bring any of

these items with her to her interview for Lead Support Teacher.

164.    Since Dr. Wolosky did not have any information regarding McTighe, she asked Dr. Kasunich for her resume or file so that she could include relevant information in the introductory email.  Dr. Kasunich directed Dr. Wolosky to obtain the file from his secretary, Joyce Hannen.

165.    On February 8, 2012, Dr. Wolosky again met with Dr. Kasunich to advise him of the work she had performed to comply with the tasks on the improvement plan.

166.    Dr. Wolosky provided an update on the new filing system; approximately one half of the filing had been completed, and the secretarial staff had been working Saturdays and Sundays in an effort to complete the task as soon as possible.  Dr. Wolosky also reported on the amount of overtime the secretaries worked in the previous month.

167.    Dr. Wolosky advised that the teachers were still confused about when Notices of Recommended Educational Placement (NOREPs) need to be issued.

168.    Dr. Wolosky had previously informed Defendant Kasunich that NOREPs only need to be issued under certain circumstances, but if the services never change, then the District does not need to issue a NOREP at each annual meeting, because doing so requires extra paperwork, and IDEA was designed to reduce the amount of paperwork in special education.

169.    In January 2012, Dr. Kasunich had called Dr. Wolosky and McTighe to his office and questioned Dr. Wolosky as to why Trinity was issuing NOREPs annually.

170.    Dr. Wolosky responded that Dr. Kasunich had directed her to do so, as indicated in the Unsatisfactory rating/PIP letter on October 25, 2011.

171.    Dr. Kasunich asked Dr. Wolosky why he had ordered her to issue them annually.

172.    Dr. Wolosky told him that it must have been a recommendation from either Dr. Merhaut or Dr. Fair, since it was contained in KECG's report; McTighe stated that she would ask Dr. Merhaut.

173.    McTighe had asked Dr. Merhaut, and he agreed that what Dr. Wolosky had been doing was correct: that NOREPs need to be issued only for change of placement and did not need to be issued annually.

174.    In light of this confirmation that Dr. Wolosky had been right all along, at the February 8 meeting, Dr. Wolosky asked Dr. Kasunich if he had now reached a decision on what practices he wanted the teachers to follow.

175.    Dr. Kasunich refused to acknowledge that Dr. Wolosky was correct in the instructions that she provided to her staff, and that the KECG consultants were wrong, both in the written report, and repeatedly in their presentations to the Special Education teachers at TASD.

176.    Dr. Kasunich did not rescind his previous order, and the teachers continued, incorrectly and unnecessarily, to issue NOREPs at each annual IEP meeting.

177.    Dr. Wolosky also told Dr. Kasunich that the special service aides need to know if they are to work with other students within the classroom if the needs of the assigned student are being met.

178.    Dr. Wolosky asked Dr. Kasunich for his guidance on how he wanted her to direct the aides on this issue; Dr. Kasunich did not provide any directive.

179.    Dr. Wolosky explained in detail why the directives he had given her on February 6 did not make sense, for various reasons ranging from impossibility, to being contrary to the mandate of the controlling regulations, to inefficient use of Dr. Wolosky's time.

180.    By way of illustration and not limitation, it was recommended that Progress Monitoring be "written on the goal pages of the IEP. This is nonsensical because the progress monitoring notes are entered directly onto the IEP in the computer database.  Under Dr. Wolosky, TASD was commended by the Department of Education for having embraced the use of technology.

181.    Dr. Kasunich also recommended Special Education teachers write and send the IEP home two days before the meeting, which should not be done as it suggests "predetermination" of the IEP, which is prohibited.

182.    This action would require more work for the Special Education teachers and secretarial staff, thus TASD would incur additional costs for mailing, secretarial/clerical work, and paperwork.

183.    It was further recommended that the special education teacher only review the "main parts" of the IEP with the IEP team at the IEP meeting.

184.    This recommendation is patently out of compliance with PDE regulations concerning a fundamental aspect of the IEP process; it is *mandatory* that *all sections* of the IEP be reviewed at the IEP meeting.

185.    It was recommended that the special education teachers be assigned the additional paperwork task of completing agendas for each IEP meeting.

186.    No need existed for an agenda at each IEP meeting, because the "agenda" for such meetings is mandated by the regulations: the team reviews all sections of the IEP.

187.    Dr. Kasunich was unable to provide Dr. Wolosky any answers or explanations to the questions that she posed.

188.    Near the end of the meeting Dr. Kasunich again added two new requirements to Dr. Wolosky's PIP.

189.    Dr. Kasunich ordered Dr. Wolosky to complete a weekly activity log, commencing Monday, February 13, 2012.

190.    Dr. Kasunich also directed Dr. Wolosky to use the District cell phone to keep her schedule and appointments (in addition to the two other calendars Dr. Wolosky already maintained), and that she was to have it with her at all times.

191.    Dr. Wolosky had previously been chastised when McTighe reported Dr. Wolosky had not answered her cell phone when she was in the restroom.

192.    Dr. Kasunich did not use Dr. Wolosky's time-consuming weekly reports to provide any feedback on improving her performance, and only commented on the substance of them on two occasions: once when he questioned why she attended Early Intervention meetings, and attended an event at Trinity North, and once when he requested more detail on her extended school year activities.

193.    On February 13, 2012, Dr. Wolosky asked Joyce Hannen for McTighe's personnel file.

194.    Ms. Hannen refused to give Dr. Wolosky the file until she talked to Dr. Kasunich, and said that Dr. Kasunich had McTighe's file, because Dr. Kasunich always keeps the files "until they are complete."

36

195.    On another occasion Dr. Wolosky asked Joyce Hannen a question regarding McTighe's Act 24 Clearances and her response was "we don't do that here."[2]

196.    On February 14, 2012 Dr. Wolosky conducted an internet search and discovered online court records showing that McTighe had received at least 2 recent citations for DUI, both highest concentration offenses.  During McTighe's employment at TASD, Dr. Wolosky and many others observed her using an interlocking ignition starter.

197.    Dr. Wolosky was alarmed and reasonably believed that hiring McTighe was in violation of Act 24, and continued to ask to review McTighe's file, but was uniformly denied.

198.    On February 17, 2012 Dr. Wolosky emailed her activity log to Dr. Kasunich. He responded on February 21, 2012, "Pam, Continue to provide log on weekly basis."

199.    On February 22, 2012, Dr. Beth Tully, another older strong female administrator went into Dr. Kasunich's office to discuss a matter related to a teacher.

200.    When Dr. Tully left his office, she had a look of disbelief on her face, and reported to Dr.

---

[2] Pennsylvania Act 24 of 2011 made changes to Section 111 of the School Code, effective September 28, 2011.  All employees (and contractors with any contact with students) are required to have a background check completed before working.  Section V requires school administrators to order a background check upon reasonable belief that an existing  employee was arrested or convicted of a Section 111 (e) offense.

Wolosky and two others, that she had begun discussing one of her teachers, but Dr. Kasunich had abruptly changed the subject and said that he believed that she needed to retire.

201.    Dr. Tully provided Dr. Wolosky a copy of her letter to Dr. Kasunich dated February 29, 2012, in which Dr. Tully complained of his discriminatory treatment on February 22, 2012.

202.    On February 22, 2012, Dr. Kasunich attacked Dr. Wolosky concerning the Chapter 15/504 Services Agreements, which were not Special Education documents, " **I would also like to know why this hasn't already happened.**"

203.    These agreements were not Dr. Wolosky's responsibility; Dr. Kasunich subsequently imposed the non-Special Education duty to complete them on Dr. Wolosky's staff anyway.

204.    On February 23, 2012, Dr. Wolosky and McTighe met with M'Liz Held, Trinity's Single Point of Contact (SPOC) with the  Pennsylvania Department of Education (PDE) in Dr. Wolosky's office, who would be conducting the upcoming compliance monitoring.

205.    The purpose of hiring of a Lead Support Teacher was to assist in completing the additional work of the Special Education Department in preparation for the compliance monitoring, but McTighe's presence was an impediment to getting work done.

206.    Dr. Wolosky and others observed that McTighe did not know how to calculate caseloads; she

was having so much difficulty with understanding how to perform the calculation that Dr. Wolosky provided her with a Post-it note, on which she demonstrated the calculations for McTighe.

207.    McTighe's math skills were so deficient that she required assistance from secretary Kim Habe to calculate her mileage and her daily rate of pay, and to accurately report the number of days that she worked each week.

208.    Dr. Wolosky assigned McTighe the task of completing the EBR (Educational Benefits Review) section of the FSA for the compliance monitoring report.

209.    McTighe worked with several teachers in completing the EBR, who reported to McTighe that errors were being made in the EBR.

210.    The teachers reported to Dr. Wolosky that McTighe insisted that her answers and determinations were correct, and prevented them from correcting the errors.

211.    Dr. Wolosky began to believe McTighe was purposely trying to sabotage Dr. Wolosky's work.

212.    Dr. Wolosky was so concerned that McTighe was intentionally trying to undermine her work, that Dr. Wolosky had to make duplicate copies of the students' files that were selected for review by PDE, so that if McTighe tampered with the files, she would tamper with a "dummy" file, while

the original files were stored under lock and key in another file.

213.    The secretaries would not leave the office unattended while Dr. McTighe was there.  Dr. Wolosky had to transport work related to the compliance monitoring home with her on a daily basis for fear that her materials would be tampered with or disappear.

214.    Dr. Wolosky told McTighe that she would submit the completed FSA and EBR portions of the compliance monitoring report on Monday, March 5, 2012.

215.    However, Dr. Wolosky and Becky Siembak, the Department Chair for Special Education, who Dr. Wolosky was mentoring for her Supervisory Special Education Certificate, worked late after school and completed and submitted the documents on March 1, 2011 in order to avoid the possibility of McTighe sabotaging this work.

216.    On March 6, 2012 Dr. Wolosky requested that McTighe go to East Elementary School to provide Special Education instruction due to a staffing shortage.  McTighe flatly refused to follow Dr. Wolosky's order and refused to go.

217.    On March 7, 2012, Dr. Kasunich gave Dr. Wolosky a list of eleven items that were described as "concerns that have arisen in regards to your performance as Special Education Director" and ordered her to prepare a comprehensive written response by the following week.

218.    Dr. Wolosky suffered a panic attack and called off sick for the next several days and sought medical care for the physical effects of Dr. Kasunich's systematic abuse.

219.    On March 12, 2012, though she was off sick, Dr. Wolosky submitted her written response rebutting Dr. Kasunich's March 7 accusations, which expressly stated, **"I believe these tasks are discriminatory and designed to create a hostile work environment in order to pressure me into early retirement."**

220.    On March 13, 2012 Dr. Wolosky reported off sick.  Upon her return to work,  Dr. Wolosky's secretaries reported that while Dr. Wolosky was out sick, McTighe said, **"You know what?  I bet that we hear from Dr. Pam or get a letter from her by Friday saying that she will be out sick for the rest of the year and I will be appointed as Acting Director of Special Education.**"

221.    On March 15, 2012, Dr. Wolosky spoke to M'Liz Held at the monthly LEA Meeting, who informed Dr. Wolosky that on March 13, 2012 she had received an email from Amy McTighe saying that Dr. Wolosky has been gone for 4 days and no one knows where she is, and asking Ms. Held to send all of the information regarding the Compliance Monitoring to her.  Ms. Held did not do so.

222.    On March 19, 2012, Dr. Wolosky wrote Dr. Kasunich protesting her humiliating demotion in status, and the false accusation that she had acted unprofessionally towards McTighe.

223.    On March 26, 2012, Dr. Kasunich was highly upset and agitated that Dr. Wolosky had pulled

her protégé, Ms. Siembak, from her classroom in order to assist her with accurately completing the FSA portion of the compliance monitoring report and submitting it on time, accused her of insubordination, and forbade her from using Ms. Siembak again.

224.    Ms. Siembak's assistance was necessitated because Dr. McTighe's involvement was a hindrance.

225.    On March 21, 2012, McTighe volunteered, so Dr. Wolosky provided McTighe with the amended Behavior Support Policy which needed to be delivered to Judy Walz so it could be read, voted on and approved by the Board prior to the compliance monitoring.

226.    McTighe spoke to Dr. Kasunich about the need for the new policy, but did not deliver it, causing the District to be out of compliance for this item on the Compliance Monitoring report.

227.    On March 23, 2012, Dr. Wolosky received an email from a School Psychologist reporting that McTighe had directed the IEP staff to complete a form incorrectly and refused to permit them to complete the form correctly.

228.    On March 28, 2012, McTighe believed that Dr. Wolosky was missing some sign-in sheets for meetings, which were needed for the compliance monitoring, however  McTighe did not inform Dr. Wolosky of the alleged missing documentation, nor did she take any other action to address it in advance of the compliance monitoring.

229.    On March 30, 2012, after extensive instruction, Dr. McTighe remained unwilling or incapable of completing the teachers' rosters or the caseload charts for the compliance monitoring.

230.    On March 30, 2012, Dr. Wolosky met with M'Liz Held, Elaina Zitney, the IU1 Supervisor assigned to TASD, and McTighe for compliance monitoring preparation.

231.    The team reviewed the FSA and Ms. Held requested items if they were missing, needed changed, or clarified. The secretaries in the Special Education office assisted in complying with requests from Ms. Held, such as making copies, or pulling student files.

232.    On Sunday, April 1, 2012, McTighe talked with Dr. Kasunich and went over what had occurred on Friday during the compliance monitoring preparation.

233.    On Monday, April 2, 2012, M'Liz Held reported to Dr. Wolosky that after the District's Overview and Introduction of CMCI Team and School District Personnel meeting that morning, Dr. Kasunich caught Ms. Held as she was leaving the Board room and questioned her approach to the compliance monitoring that she was running at TASD.

234.    Also at the conclusion of the successful opening presentation meeting, McTighe gratuitously attempted to inform Ms. Held of what McTighe incorrectly asserted were deficiencies in the District's documentation, (e.g. sign-in sheets) in a further attempt to sabotage the compliance monitoring.

235.    Ms. Held told Dr. Wolosky that Dr. Kasunich had insinuated that Ms. Held was giving Dr. Wolosky more assistance than other districts would receive, and that Ms. Held responded that she is conducting this monitoring as she does with all of her school districts.

236.    On April 4, 2012, at the conclusion of the Exit Conference, M'Liz Held contacted her supervisor, Jean Inskip at the Pennsylvania Department of Education in Harrisburg and requested that she attend the first onsite visit on June 18th.

237.    On April 10, 2012, Dr. Kasunich met with McTighe and approved the $199.00 expense for her attendance at a training for managers on April 27th, unrelated to Special Education; TASD employees must submit such requests for approval a year in advance to be budgeted.

238.    Dr. Kasunich later overrode Dr. Wolosky's disapproval, and approved McTighe being paid for working on April 27, though she informed Dr. Kasunich that she would not report to work at all on that day.

239.    At the same meeting, Dr. Kasunich  and McTighe discussed, "IU1 services for Social Workers and School Psychologists, looking into getting an intern from a university for Psychologist."  This had not been discussed with Dr. Wolosky.

240.    On April 10, 2012, McTighe falsely reported to Dr. Kasunich that the contracted social worker provided services to students who did not need them.

241.    On April 11, 2012, McTighe falsely reported that Dr. Wolosky instructed principals that they could suspend MR students and just needed to let the Special Education Department know about it.

242.    McTighe was off on April 16, 2012, but claimed pay for that date and Dr. Kasunich overrode Dr. Wolosky's denial, and approved it.

243.    On April 17, 2012, Dr. Wolosky was excluded from a meeting attended by Dr. Kasunich, Assistant Superintendent Lucas, and McTighe to discuss teacher transfers within the Special Education Department for the next year, which changes were announced on April 20, 2012.

244.    On April 17, 2012, Dr. Kasunich requested zero school psychologists from IU1 for SY 2012-2013, and informed Dr. Wolosky that Trinity would hire its own psychologist, without any consideration or investigation of whether a single psychologist could handle the workload.

245.    The first inquiry concerning the volume of cases handled by the school psychologists each year was not made until the first week in May, and showed a steady increase in referrals up from 105 in SY 2008-2009 to 174 in SY 2011-2012 through April 30, 2012.

246.    Because Dr. Kasunich and McTighe intentionally excluded Dr. Wolosky from the decision-making process concerning the needs and budget of the Special Education Department, and refused her request to continue with three contracted school psychologists, the District ended up paying about $30,000 *more* for psychologist services for the 2012-2013 school year by hiring one full-time employee, and then in September 2012, the District hired a second, contracted school psychologist

at additional expense.

247.    On April 18, 2012, Dr. Kasunich attended his first IEP meeting ever.  Dr. Kasunich refused to permit Dr. Wolosky to respond to the false accusations against her by the parents and allowed Dr. McTighe to report, falsely, that the student was owed eleven (11) sessions instead of the correct number, which was, at most one (1). Don Snoke agreed that Dr. Wolosky had been "set up."

248.    On May 1, 2012, Dr. Kasunich falsely accused Dr. Wolosky of not following policy to schedule days off for medical reasons, which Dr. Kasunich easily could have confirmed because Dr. Wolosky had properly used the computerized Aesop system to do so.

249.    On May 3, 2012, Dr. Wolosky's EEOC Charge and PHRC Complaint was filed and hand-delivered to Dr. Kasunich and all the members of the Trinity School Board.

250.    On May 4, 2012, McTighe did not work. Dr. Wolosky denied authorization to pay her for this day, which denial was again overridden by Dr. Kasunich.

251.    On May 7, 2012, before the end of the rating period, Dr. Kasunich met with Dr. Wolosky and gave her a formal Unsatisfactory rating for SY 2011-2012, rating her unsatisfactory in all categories, using the PDE Form 428 and not the rating forms required to be used under the Act 93 agreement. He also imposed a new PIP.

252.    Dr. Kasunich received the Report of Compliance Monitoring from the PDE on May 7, 2012,

and met with Dr. Wolosky that day, but he did not provide it to Dr. Wolosky, or even mention it.

253.    Items which are found to be out of compliance in the report are to be corrected by the District, and certain corrections, including one at Trinity, are required to be made immediately in order to avoid liability for claims for compensatory education. Dr. Kasunich did not forward the report to Dr. Wolosky until May 24th.

254.    On May 10, 2012, Dr. McTighe's duties for the rest of the year were identified, including, "create a plan for utilization of psychological services," but she did not complete them.

255.    For example, McTighe's "plan" was to suggest that Dr. Wolosky contact the University of Pittsburgh where McTighe said she was a "professor" and secure a student intern to provide psychological services.  When Dr. Wolosky contacted the department chair to request an intern, she was told that none were available, and that Pitt has not had a school psychologist program for at least eight years.

256.    On May 11, 2012, Dr.  Wolosky received an email from M'Liz Held which advised Dr. Wolosky that the  Compliance Monitoring report documents had been sent to the District, and asking her to reconvene an IEP and to provide Compensatory Education before June 4, 2012 for the single student whose file review revealed the student did not make progress so that she can "close that out" (report that it had been corrected).

257.    On May 14, 2012, Dr. Kasunich falsely stated that he did not receive Dr. Wolosky's weekly

activity log, which she later proved she had sent him on the 11th.

258.    On May 15, 2012, a female special education teacher over 40, sent a letter to the School Board describing the emotional distress and anxiety that she had experienced as a result of an involuntary transfer to the high school to serve as a special education teacher, which she believed was discriminatory.

259.    On May 21, 2012, Dr. Wolosky was the only administrator not assigned a date and time for her final goals meeting.

260.    On May 21, 2012, Dr. Kasunich added a new requirement to the PIP, now requiring Dr. Wolosky to include the full names of students and the names of the parents in her phone and activity logs and to improve her handwriting, and again threatened that failure to comply may result in termination.

261.    On May 24, 2012, Dr. Kasunich gave Dr. Wolosky the hard copy of the PDE Compliance Monitoring report.  The File review portion of the report found only 43 deficiencies, out of 960 items checked.

262.    The Educational Benefit Review (EBR) portion of the compliance report, which was conducted by McTighe, was found to be out of compliance.

263.    Special Education teachers had informed McTighe that the information she included in the

EBR was wrong, but McTighe refused to correct it.

264.    The District's Positive Behavior Support Policy was also found to be out of compliance because McTighe had volunteered to, but, after meeting with Dr. Kasunich did not, deliver it to ensure the Board could conduct the necessary readings and vote on it before the compliance monitoring.

265.    The PDE does not grade or rate the outcome of its compliance monitoring audit in any fashion, but Trinity's 2012 audit was routine and nothing stood out as a major issue which needed to be addressed.

266.    On May 30, 2012, Dr. Kasunich wrote Dr. Wolosky, and copied it to her personnel file, adding to the "Improvement Plan," a directive that she provide a detailed explanation of her activities related to the Extended School Year (ESY) program no later than May 31, 2012, and concluded, "Failure to complete the improvement plan may result in discipline up to and including termination."

267.    On June 1, 2012, Dr. Wolosky's request to review the personnel file of her "subordinate," McTighe, for purposes of ensuring compliance with state law and the safety of the children entrusted to her care, was denied by Dr. Kasunich without any explanation.

268.    On June 4, 2012, Dr. Wolosky was called to join a meeting in progress between Dr. Kasunich and a student and mother, concerning request for placement in a program in another District. During the meeting, Dr. Kasunich yelled at the mother and the student, and stood up and paced around the

room, red faced and animated as he continued his abusive tirade.

269.    That afternoon, the mother emailed Dr. Kasunich and others, describing his demeanor and conduct at the meeting, including, "I am emailing because the meeting I had with you today has me feeling very uneasy, **threatened** appauled [sic], upset, **I could even say when you stood up and looked down on me I felt a little scared**. I personally do not know you and I feel like after today's meeting **I fear for myself and the school district if people are spoken to and treated like this**....My son was highly upset the way you was speaking to me and after we left the school I was crying, upset, I do not feel I was treated like a human being I feel you belittled me today." (Emphasis added).

270.    On June 7, 2012, Dr. Kasunich abruptly removed Dr. Wolosky's secretary Ms. Staggers, who thought she was being fired, but who was reassigned.

271.    On June 11, 2012, even though Dr. Kasunich had already personally signed over ten separate documents authorizing the overtime payments, he falsely accused Dr. Wolosky of disregarding a March order not to authorize overtime, and unequivocally stated that her staff members would not be paid for overtime they already worked.

272.    On June 18, 2012, Dr. Wolosky and her staff met with the PDE representatives, Ms. Held and Ms. Inskip as part of the monitoring process Dr. Kasunich again arrived late, conducted himself dismissively towards Dr. Wolosky and the other women in attendance, did not even introduce himself, and left the meeting early.

50

273.    After the meeting, Ms. Inskip remarked that Dr. Kasunich had been really rude.

274.    At this meeting, the PDE representatives recommended the District attend a free training on Inclusive Practices, which would help in one area in need of more development, Least Restrictive Environment.

275.    On June 19, 2012, the IU1 informed Dr. Wolosky that Dr. Kasunich had given permission for the IU1 autistic teacher to write an IEP for a student who was transitioning from Early Intervention.

276.    Dr. Kasunich had not consulted or informed Dr. Wolosky of this, which would have resulted in the classroom being over caseload under PDE regulations, had the IU1 not informed her.

277.    On June 20 2012, McTighe responded to an inquiry from Dr. Wolosky about the autistic support plan McTighe was to have developed as one of her tasks following the May 10 meeting, "There is not a plan for support that I (McTighe) provided because it is based on individual parent and IEP team decisions for each student."

278.    On June 25th, Dr. Wolosky learned from a Hearing Officer, that there was a Hearing for Due Process scheduled for a student.

279.    Only because Dr. Wolosky responded to all addressees of the email, did she learn from the attorney for the parent, that a Resolution Meeting was scheduled for that Friday June 29th.

280.    Dr. Wolosky was not informed of these facts by Dr. Kasunich or Mr. Makel.

281.    Dr. Wolosky attended the session and noted a critical fact that was either ignored or overlooked by both Dr. Fair and Mr. Makel; it was highly doubtful that the student was a resident in the District, which is a fundamental prerequisite to the District's duty to provide services.

282.    On June 26, 2012, Dr. Kasunich denied Dr. Wolosky's request for approval for her to attend a free training that the PDE had recommended the District attend, contrary to the May 1, 2012 PIP which directed her to "attend trainings...as you determine are necessary..."

283.    Dr. Wolosky was the only Trinity administrator who did not receive a raise for the 2011-2012 school year.

284.    Because of the harmful mental and physical effects of the relentless harassment at work, on August 3, 2012, Dr. Wolosky was forced to take sick leave for the 2012-2013 school year, and thereafter, to take a medical sabbatical for restoration of health, which continues to the present.

285.    The District also immediately removed Dr. Wolosky's access to her school email account on August 6, 2012, after she called off sick and gave notice that she had a serious health condition on August 3, 2012.

286.    Numerous other district employees who have gone on sick leave, including for as long as two years, have not similarly had their access to email cut off.

287.    On August 28, 2012, the District's designated FMLA administrator, Ms. Hannen, refused to accept hand delivery of the FMLA medical certification and told Dr. Wolosky's husband that she was not eligible for FMLA leave, but he insisted that he was turning it in.

288.    For a month after Dr. Wolosky submitted her medical certification, nobody from the District communicated with her concerning her FMLA status, and failed to provide her with notice of her FMLA eligibility within five business days as required under the statute; as a result, she was forced to continue calling off sick each day, unlike others outside of her protected classes.

289.    During the course of the EEOC's investigation, Dr. Wolosky supplemented, clarified and amplified the averments of the Charge, and reported additional instances of like and related unlawful retaliatory conduct.

290.    On March 24, 2014, Dr. Wolosky received a Dismissal and Notice of Right to Sue dated March 21, 2014; this suit was filed within ninety (90) days of receipt of the Notice.

291.    All administrative exhaustion requirements under the applicable statutes have been satisfied.

292.    Dr. Wolosky has been deprived of equal employment opportunities, and has otherwise been subjected to intentional discrimination because of her age and sex and protected activity, which has adversely affected her professional status, and has caused her to suffer economic losses (including lost wages and benefits, as well as future pecuniary losses, interest, and reasonable attorneys fees), emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other

nonpecuniary losses and damages, in violation of Title VII, the ADEA and the PHRA.

293.    The Defendants' acts towards Dr. Wolosky in violation of the statutes were intentional and willful.

Count 1: Sex Discrimination

Wolosky v. Trinity Area School District

Title VII

294.    Plaintiff incorporates paragraphs 1 through 293 as though the same had been fully set forth at length herein.

295.    Defendant treated Plaintiff differently and less favorably than similarly-situated males in her terms, conditions, rights and privileges of employment, in violation of Title VII.

296.    Defendant also paid Plaintiff less than similarly-situated males, in violation of Title VII.

297.    Defendant's actions in violation of Title VII were because of Plaintiff's sex.

298.    As a direct and proximate result of Defendant's actions in violation of Title VII, Plaintiff suffered lost wages and benefits, lost employment opportunities and future income and benefits, as well as humiliation, inconvenience, mental distress and embarrassment.

WHEREFORE, Plaintiff demands judgment pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e et seq.


Count 2: Retaliation

Wolosky v. Trinity Area School District

Title VII


299.    Plaintiff incorporates paragraphs 1 through 298 as though the same had been fully set forth at length herein.


300.    Plaintiff complained to Defendant and opposed disparate treatment which she believed in good faith violated Title VII and participated in an investigation under 42 U.S.C. §2000e-3.


301.    Plaintiff's complaints, opposition, and participation constituted protected activity under Title VII.


302.    Defendant denied Plaintiff equal treatment in her terms and conditions, rights and privileges of employment, which treatment was materially adverse, after, and because of her protected activity, in violation of Title VII.


303.    As a direct and proximate result of Defendant's actions in violation of Title VII, Plaintiff suffered lost wages and benefits, lost employment opportunities and future income, out of pocket expenses, as well as humiliation, inconvenience, mental distress and embarrassment.

WHEREFORE, Plaintiff demands judgment pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e et seq.,

Count 3: Age Discrimination

Wolosky v. Trinity Area School District

ADEA

304.    Plaintiff incorporates paragraphs 1 through 303 as though the same had been fully set forth at length herein.

305.    Defendant has engaged in unlawful employment practices because of Plaintiff's age, in violation of 29 U.S.C.§ 621 *et seq*., which violations were willful.

306.    The effect of failure and/or refusal to treat Plaintiff equally with her comparators has been to deprive Plaintiff of equal employment opportunities and otherwise to adversely affect her status because of her age, and to cause her to suffer pecuniary and non-pecuniary losses, in violation of the ADEA.

WHEREFORE, Plaintiff demands judgment pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e et seq.

Count 4: Retaliation

Wolosky v. Trinity Area School District

ADEA

307.    Plaintiff incorporates paragraphs 1 through 306 as though the same had been fully set forth at length herein.

308.    Plaintiff complained to Defendant and opposed disparate treatment which she believed in good faith violated the ADEA and participated in an investigation under 29 U.S.C. §623(d).

309.    Plaintiff's complaints, opposition, and participation constituted protected activity under the ADEA.

310.    Defendant denied Plaintiff equal treatment in her terms and conditions, rights and privileges of employment, which treatment was materially adverse, after, and because of her protected activity, in violation of the ADEA.

311.    The effect of failure and/or refusal to treat Plaintiff equally with her comparators has been to deprive Plaintiff of equal employment opportunities and otherwise to adversely affect her status because of her protected activity, and to cause her to suffer pecuniary and non-pecuniary losses, in violation of the ADEA.

WHEREFORE, Plaintiff demands judgment pursuant to 29 U.S.C. §621 et seq.

Count 5: Sex Discrimination

Wolosky v. Trinity Area School District

PHRA

312.    Plaintiff incorporates paragraphs 1 through 311 as though the same

had been fully set forth at length herein.

313.    Defendant treated Plaintiff differently and less favorably than similarly-situated males in her

terms, conditions, rights and privileges of employment because of her sex, in violation of the PHRA.

314.    As a direct and proximate result of Defendant's actions in violation of the PHRA, Plaintiff

suffered lost wages and benefits, lost employment opportunities and future income, as well as

humiliation, inconvenience, mental distress and embarrassment.

WHEREFORE, Plaintiff demands judgment pursuant to the Pennsylvania Human Relations

Act.

Count 6: Age Discrimination

Wolosky v. Trinity Area School District

PHRA

315.    Plaintiff incorporates paragraphs 1 through 314 as though the same had been fully set forth

at length herein.

316.    Defendant treated Plaintiff differently and less favorably in her terms, conditions, rights and privileges of employment because of her age, in violation of the PHRA.

317.    As a direct and proximate result of Defendant's actions in violation of the PHRA, Plaintiff suffered lost wages and benefits, lost employment opportunities and future income, as well as humiliation, inconvenience, mental distress and embarrassment.

WHEREFORE, Plaintiff demands judgment pursuant to the Pennsylvania Human Relations Act.

Count 7: Aiding and Abetting Discrimination

Wolosky v. Paul Kasunich and Amy McTighe

PHRA

318.    Plaintiff incorporates paragraphs 1 through 131  as though the same had been fully set forth at length herein.

319.    Defendants Kasunich and McTighe intentionally acted in concert with Defendant Trinity in its discriminatory acts towards Plaintiff in violation of the PHRA, 43 P.S. §955(e).

320.    As a direct and proximate result of Defendants' actions in violation of the PHRA, Plaintiff suffered lost wages and benefits, lost employment opportunities and future income, as well as humiliation, inconvenience, mental distress and embarrassment.

WHEREFORE, Plaintiff demands judgment pursuant to the Pennsylvania Human Relations Act.


Count 8: Retaliation

Wolosky v. Trinity Area School District and Paul Kasunich

PHRA


321.    Plaintiff incorporates paragraphs 1 through 320  as though the same had been fully set forth at length herein.


322.    Plaintiff's complaints and participation in the EEOC/PHRC investigation constituted protected activity under the PHRA.


323.    Defendants denied Plaintiff equal treatment in her terms and conditions, rights and privileges of employment, after and because she complained of disparate treatment which she believed in good faith violated the PHRA.


324.    As a direct and proximate result of Defendants' actions in violation of the PHRA, Plaintiff suffered lost wages and benefits, lost employment opportunities and future income, out of pocket expenses, as well as humiliation, inconvenience, mental distress and embarrassment.


WHEREFORE, Plaintiff demands judgment pursuant to the PHRA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Court:


A )      Grant a permanent injunction enjoining Defendant Trinity, its directors, officers,

employees, agents, successors, heirs and assigns, Defendant Kasunich, Defendant

McTighe, and all persons in active concert or participation with them, from engaging in,

ratifying, or refusing to correct, employment practices which interfere with the exercise of

rights and/or discriminate in violation of Title VII, the ADEA and the PHRA;


B)      Order Defendant Trinity to institute and implement, training  programs, policies, practices

and programs designed to ensure the District provides equal employment opportunities

for  women and persons over age forty, and those who engage in statutorily protected

activity;


C)      Order all Defendants to make whole Pamela Wolosky, by providing appropriate back pay

with prejudgment interest, in amounts to be determined at trial, credit to her sick leave

balance for the days she was forced to use because of Defendants' unlawful conduct,

make contributions to her pension account, and all other affirmative legal and equitable

relief necessary to eradicate the effects of its unlawful employment practices;


D)      Order all Defendants to pay Plaintiff compensatory damages in an amount to be

determined at trial;

E)    Order all Defendants to pay Plaintiff the reasonable attorney's fees and costs and other

legal expenses incurred by Plaintiff in this matter;

F)    Order Defendant Trinity to remove and expunge, or to cause to be removed and

expunged, the Unsatisfactory rating, together with all other negative, discriminatory,

and/or defamatory memoranda and documentation from Plaintiff's record of employment;

G)    Order all Defendants to pay Plaintiff an additional amount to offset the negative tax

consequences of the balance of the court's award, in order to effectuate the essential

purpose of the remedial goal expressed in the statutes, of making whole the victim of

discrimination;

H)    Order Defendant Trinity to pay liquidated damages for its willful violation of the ADEA.

I)    Award such other legal and equitable relief as the court deems appropriate and just.

**A jury trial is demanded as to all issues triable to a jury.**

Respectfully submitted,

Filed on: <u>June 18, 2014</u>                s/Christian Bagin
Christian Bagin
PA ID #85511

Wienand & Bagin
First & Market Building
100 First Avenue, Suite 1010
Pittsburgh, PA 15222
PH: 412-281-1110
FAX: 412-281-8481
Christian@wienandandbagin.com

62