IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| PAMELA WOLOSKY, : | Civil Action No. 2:14-cv-00804-NBF |
| Plaintiff, : | |
| vs. : | JURY TRIAL DEMANDED |
| TRINITY AREA SCHOOL DISTRICT, : PAUL KASUNICH, AMY MCTIGHE, : | |
| Defendants. : | |

**BRIEF IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS PURSUANT TO RULE 12(B)(6)
OF THE FEDERAL RULES OF CIVIL PROCEDURE**

Defendants Trinity Area School District, Dr. Paul Kasunich, and Amy McTighe by and through their attorneys, John Smart, Esquire and the law firm of Andrews & Price, LLC file the following Brief in Support of Defendants' Motion to Dismiss Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure:

## I.   BACKGROUND

As required by Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Defendants assume Dr. Pamela Wolosky's, ("Plaintiff's" or "Dr. Wolosky's"), well-plead allegations to be true, and views all facts in the light most favorable to her. Viewed according to these standards, the facts affecting Dr. Wolosky's claims against the Defendants are construed as follows for purposes of resolving the Motion to Dismiss.[1]

Defendant Trinity Area School District, ("Defendant," "Trinity," "TASD", or, "the District") is a school district having its central office located in Washington County Pennsylvania, and is an employer of more than 500 persons. (Complaint at ¶ 6).

---

[1] In accordance with the standard of review, the "facts" relevant to this Motion to Dismiss are taken from the Plaintiff Dr. Wolosky's extensive Complaint. By no means do the Defendants concur with this rendition of the facts other than for the purpose of resolving this motion.

At all times relevant hereto, Defendant Dr. Paul Kasunich ("Dr. Kasunich") was employed as the Superintendent of Trinity. (Complaint at ¶ 9). Dr. Kasunich began working for Trinity as Superintendent in April 2010. (Complaint at ¶ 16).

Defendant Amy McTighe ("McTighe") contracted with Trinity to serve as the "Special Education Lead Support Teacher" for the period January 23, 2012 through June 22, 2012. (Complaint at ¶ 151).[2] McTighe had just resigned as a Life Skills teacher from the Hampton Township School District on October 31, 2011. (Complaint at ¶ 125).

Plaintiff, Dr. Wolosky, is a 58 year-old female resident of Washington County, Pennsylvania. (Complaint at ¶ 2). At all times relevant hereto, Wolosky was the Director of the Department of Special Education at Trinity. (Complaint at ¶ 17). As Director of Special Education, Dr. Wolosky reported directly to Dr. Kasunich. (Complaint at ¶ 17).

On or about the summer of 2011, Trinity contracted with the Keystone Education Consulting Group (KECG) to provide training and help prepare for the state's Cyclical Monitoring audit. (Complaint at ¶ 68). Dr. Wolosky's subordinates made complaints to KECG about the Special Education Department. (Complaint at ¶ 70).

On September 8, 2011, Dr. Wolosky met with Dr. Kasunich (Complaint at ¶ 49). Dr. Kasunich explained that Dr. Fair from KECG and then-District Solicitor Dennis Makel were going to write about how disorganized the Special Education Office was. (Complaint at ¶ 54).

In 2011, Dr. Kasunich paid KECG to visit the District. KECG subsequently conducted training in the field of Special Education that was allegedly inaccurate and inconsistent with then-current regulations. (Complaint at ¶ 68; ¶ 110). On October 25, 2011, Dr. Kasunich

---

[2] According to her resume, in 2012, McTighe purportedly earned an online doctorate in Philosophy in 2010 and worked as a Life Skills teacher for nine years: two years as an Autistic Support teacher and three years as a part-time instructor at Pitt. (Complaint at ¶ 11). McTighe did not actually complete the requirements for the doctorate degree. (Complaint at ¶ 138).

personally issued a letter notifying Dr. Wolosky of an unsatisfactory rating and the implementation of an improvement plan ("PIP"). (Complaint at ¶ 93 - 96). Dr. Wolosky found it impossible to complete the improvement plan, because Dr. Kasunich constantly changed the requirements of the PIP. (Complaint at ¶ 102).

By November 2, 2011, Dr. Kasunich received KECG's written report and provided Dr. Wolosky a copy following her request of the same. (Complaint at ¶¶ 111 – 112). On November 7, 2011, Dr. Wolosky submitted a letter to Dr. Kasunich rebutting the information contained in the October 24, 2011 "Unsatisfactory Rating" letter and PIP. (Complaint at ¶114). She requested that the unsatisfactory rating be rescinded. (*Id.*).

On November 16, 2011, the Intermediate Unit 1 ("IU1") posted a job for a teacher: Lead Support for the Special Education Department at Trinity Area School District. Deadline to Apply: November 23, 2011. Start Date: December 1, 2011. (Complaint at ¶ 126). On November 23, 2011, Dr. Wolosky informed Dr. Kasunich that there were two Intermediate Unit 1 candidates available to be interviewed for the Lead Support Teacher position on November 29th or 30th. (Complaint at ¶ 129).

On November 29, 2011 at 10:29 a.m., Leigh Dennick, Director of Special Education Services at IU1, emailed Dr. Wolosky inquiring if Dr. Kasunich had discussed the meeting with the IU staff members at the end of the day. Dr. Wolosky sent an email to Dr. Kasunich regarding meeting the two candidates from the IU1 later in the day. (Complaint at ¶ 130).

At 11:06 a.m., Dr. Kasunich emailed Dr Wolosky: "Pam, Joe [Merhaut of KECG] and I have scheduled an interview with Amy McTighe in regards to the Lead support position. Amy worked for Hampton for 10 years and was extensively involved in their audit last year. She will be coming in on 12/7/11 at 9:00 a.m. Please make every effort to attend." (Complaint at ¶ 131).

No one explained to Wolosky why a non-District employee (Merhaut) was participating in the hiring process. (Complaint at ¶ 132).

Based on Dr. Wolosky's experience at Trinity, the standard hiring practice is that the job requirements are posted on TASD's website. (Complaint at ¶ 133). The applicants provide the required materials. (*Id.*). Only after reviewing the resume and additional documents, checking for accuracy and compliance, an interview is scheduled with the top candidates. (*Id.*). Previously, TASD required that three individuals be interviewed for each position. (Complaint at ¶ 134). At the interview, an informational packet was provided to the interviewers that contained all of the materials mandated by TASD. (*Id.*). It has been TASD's policy that individuals who submitted incomplete packets did not receive an interview. (Complaint at ¶ 135). During Defendant McTighe's hiring process, none of these standard procedures was followed. (Complaint at ¶ 136). No reference check with Defendant McTighe's previous employer was conducted, despite the public knowledge that Defendant McTighe had resigned from a tenure track position. (Complaint at ¶ 137).

On December 7, 2011, Dr. Kasunich, Dr. Merhaut[3] and Dr. Wolosky interviewed Amy McTighe for the position of Lead Support Teacher. (Complaint at ¶ 139). Defendant McTighe brought nothing to the interview with her. (Complaint at ¶140). No formal interview was conducted and no scoring occurred. (Complaint at ¶ 139).

Shortly after the "interview," Defendant Dr. Kasunich entered the Special Education Office and asked Dr. Wolosky what she thought about McTighe. (Complaint at ¶ 142). Dr. Wolosky replied that she appeared "nice" but that she did not know much about her and her

---

[3] During the "interview," Dr. Merhaut announced that McTighe was the best candidate for the position and that he would say that, "even if [McTighe] was not related to [him]." (Complaint at ¶ 141). He also praised, "She did it all" at Hampton, referring to the compliance monitoring that Hampton had completed the previous school year. (*Id.*). Dr. Merhaut also mentioned that McTighe was a student at Hampton when he was a principal there. (*Id.*).

experiences related to Special Education. (*Id.*). Dr. Kasunich replied that is ok, "She is your new Lead Support Teacher." [4] (*Id.*).

On January 11, 2012, Dr. Kasunich verbally rebuked Dr. Wolosky for informing relevant District staff in December 2011 of staff reassignments to be effective in the January 2012 term. (Complaint at ¶ 148). On January 19, 2012, the Trinity School Board voted to approve the contract with McTighe as the Special Education Lead Support Teacher for the period January 23, 2012 through June 22, 2012. (Complaint at ¶ 151).

"On January 23, 2012, the TASD teachers' association filled [sic] a grievance over the hiring of McTighe, asserting the improper filling of vacancies." (Complaint at ¶ 152). One day later, Trinity changed McTighe's title from the "Special Education Lead Support Teacher" to "Assistant to the Director of Special Education". (Complaint at ¶ 153). Therefore, for a period of about six (6) months in 2012, McTighe was the Assistant to the Department of Special Education at Trinity. (Complaint at ¶¶ 152 -153).

Dr. Kasunich allegedly hand-picked McTighe and "effectively made her the Director of the Special Education Department at Trinity." (Complaint at ¶ 12). A Special Education teacher informed Dr. Wolosky that McTighe had told a Special Education teacher that Dr. Kasunich had asked McTighe to come up with four or five items that need to be improved within the Special Education Department, and McTighe asked him for suggestions. (Complaint at ¶ 155).

On February 6, 2012, Dr. Wolosky met with Dr. Kasunich and McTighe regarding identifying McTighe's duties, because the staff was confused by the directives McTighe was

---

[4] The two IU candidates were not interviewed, because they allegedly withdrew from consideration. (Complaint at ¶ 143). Dr. Wolosky called the IU and relayed this to Leigh Dennick. (Complaint at ¶ 144). They discussed the fact that since Dr. Kasunich had already made his decision to hire McTighe, it would be useless to schedule any interviews with the IU candidates, especially since he had never returned any of their calls regarding hiring a Lead Support Teacher. (*Id.*).

issuing, which were contrary to the training and directives Dr. Wolosky gave them. (Complaint at ¶ 156).

In January 2012, Dr. Kasunich had called Dr. Wolosky and McTighe to his office and questioned Dr. Wolosky as to why Trinity was issuing NOREPs annually. (Complaint at ¶ 169). Dr. Wolosky responded that Dr. Kasunich had directed her to do so, as indicated in the Unsatisfactory rating/PIP letter on October 25, 2011. (Complaint at ¶ 170). McTighe asked Dr. Merhaut, and he agreed that what Dr. Wolosky had been doing was correct: NOREPs needed issued for change of placement, only, and did not need to be issued annually. (Complaint at ¶ 173).

On February 23, 2012, Dr. Wolosky and McTighe met with M'Liz Held, Trinity's Single Point of Contact (SPOC) with the Pennsylvania Department of Education (PDE) in Dr. Wolosky's office, who would be conducting the upcoming compliance monitoring. (Complaint at ¶ 204). The purpose of hiring of a Lead Support Teacher was to assist in completing the additional work of the Special Education Department in preparation for the compliance monitoring, but McTighe's presence was an impediment to getting work done.[5] (Complaint at ¶ 205).

Dr. Wolosky assigned McTighe the task of completing the EBR (Educational Benefits Review) section of the FSA for the compliance monitoring report. (Complaint at ¶ 208). McTighe worked with several teachers in completing the EBR, who reported to McTighe that errors were being made in the EBR. (Complaint at ¶ 209). The teachers reported to Dr. Wolosky that McTighe insisted that her answers and determinations were correct, and prevented them

---

[5] Dr. Wolosky observed that McTighe did not know how to calculate caseloads; she was having so much difficulty with understanding how to perform the calculation that Dr. Wolosky provided her with a Post-it note, on which she demonstrated the calculations for McTighe. (Complaint at ¶ 206). McTighe required assistance from Secretary Kim Habe to calculate her mileage and her daily rate of pay, and report the number of days that she worked each week. (Complaint at ¶ 207).

from correcting the errors. (Complaint at ¶ 210). Dr. Wolosky began to believe McTighe was purposely trying to sabotage Dr. Wolosky's work. (Complaint at ¶ 211).

Dr. Wolosky was so concerned that McTighe was intentionally trying to undermine her work that Dr. Wolosky made duplicate copies of students' files that were selected for review by PDE, so that if McTighe tampered with the files, she would tamper with a "dummy" file, while the original files were stored under lock and key in another file. (Complaint at ¶ 212). The secretaries would not leave the office while Dr. McTighe was there. (Complaint at ¶ 213). Dr. Wolosky had to transport work related to the compliance monitoring home with her on a daily basis for fear that her materials would be tampered with or disappear. (*Id.*).

Dr. Wolosky told McTighe that she would submit the completed FSA and EBR portions of the compliance monitoring report on Monday, March 5, 2012. (Complaint at ¶ 214). However, Dr. Wolosky and Becky Siembak, the Department Chair for Special Education, who Dr. Wolosky was mentoring for her Supervisory Special Education Certificate, worked late after school, completed, and submitted the documents on March 1, 2011 to avoid the possibility of McTighe sabotaging this work. (Complaint at ¶ 215).

On March 6, 2012, Dr. Wolosky requested that McTighe go to East Elementary School to provide Special Education instruction due to a staffing shortage. (Complaint at ¶ 216). McTighe flatly refused to follow Dr. Wolosky's order and refused to go. (*Id.*). On March 13, 2012, Dr. Wolosky reported off sick. (Complaint at ¶ 220). Upon her return to work, Dr. Wolosky's secretaries reported that while Dr. Wolosky was out sick, McTighe said, "You know what? I bet that we hear from Dr. Pam or get a letter from her by Friday saying that she will be out sick for the rest of the year and I will be appointed as Acting Director of Special Education." (*Id*).

On March 15, 2012, Dr. Wolosky spoke to M'Liz Held at the monthly LEA Meeting,

who informed Dr. Wolosky that on March 13, 2012 she had received an email from Amy McTighe saying that Dr. Wolosky has been gone for 4 days and no one knew where she was. (Complaint at ¶ 221). McTighe asked Ms. Held to send all of the information regarding the Compliance Monitoring to her, but Ms. Held did not do so. (*Id.*).

On March 19, 2012, Dr. Wolosky wrote to Dr. Kasunich protesting her humiliating demotion in status and accusations that she had acted unprofessionally towards McTighe. (Complaint at ¶ 222).

On March 21, 2012, McTighe volunteered, so Dr. Wolosky provided McTighe with the amended Behavior Support Policy, which needed to be delivered to Judy Walz so it could be read, voted on and approved by the Board prior to the compliance monitoring. (Complaint at ¶ 225). McTighe spoke to Dr. Kasunich about the need for the new policy, but did not deliver it, causing the District to be out of compliance for this item on the Compliance Monitoring report. (Complaint at ¶ 226).

On March 23, 2012, Dr. Wolosky received an email from a School Psychologist reporting that McTighe had directed the IEP staff to complete a form incorrectly and refused to permit them to complete the form correctly. (Complaint at ¶ 227). On March 28, 2012, McTighe believed that Dr. Wolosky was missing some sign-in sheets for meetings, which were needed for the compliance monitoring. (Complaint at ¶ 228). However McTighe did not inform Dr. Wolosky of the alleged missing documentation, nor did she take any other action to address it in advance of the compliance monitoring. (*Id.*). On March 30, 2012, after extensive instruction, McTighe did not complete the teachers' rosters or the caseload charts for the compliance monitoring. (Complaint at ¶ 229). At the conclusion of a successful opening presentation meeting on April 2, 2012, (Complaint at ¶ 233), McTighe attempted to inform Ms. Held of what

McTighe incorrectly asserted were deficiencies in the District's documentation, (e.g. sign-in sheets), which Dr. Wolosky perceived as an attempt to sabotage the compliance monitoring. (Complaint at ¶ 234).

On April 10, 2012, McTighe reported to Dr. Kasunich that the contracted social worker provided services to students who did not need them. (Complaint at ¶ 240). On April 11, 2012, McTighe reported that Dr. Wolosky instructed principals that they could suspend Mentally Retarded ("MR") students and simply needed to let the Special Education Department know about it, which was incorrect. (Complaint at ¶ 241).

On April 18, 2012, Dr. Kasunich attended his first IEP meeting. Dr. Kasunich refused to permit Dr. Wolosky to respond to accusations against her by parents and allowed Dr. McTighe to report, that a student was owed eleven (11) sessions instead of the correct number, which was, at most one (1). (Complaint at ¶ 247).

Dr. Kasunich overrode Dr. Wolosky's disapproval, and approved McTighe's pay for working on April 16, April 27, and May 4, 2012. (Complaint at ¶¶ 238, 243, 250).

On May 10, 2012, Dr. McTighe's duties for the rest of the year were identified, including, "create a plan for utilization of psychological services," but she did not complete them. (Complaint at ¶ 254). When Dr. Wolosky attempted to implement McTighe's plan by contacting the University of Pittsburgh department chair to request an intern, she was told that none were available and that Pitt has not had a school psychologist program for at least eight years. (*Id.*).

On May 24, 2012, Dr. Kasunich gave Dr. Wolosky the hard copy of the PDE Compliance Monitoring report. The File review portion of the report found only 43 deficiencies, out of 960 items checked. (Complaint at ¶ 261). The Educational Benefit Review (EBR) portion of the

compliance report, which was conducted by McTighe, was found to be out of compliance. (Complaint at ¶ 262). The District's Positive Behavior Support Policy was also found to be out of compliance because McTighe had volunteered to, but, after meeting with Dr. Kasunich did not, deliver it to ensure the Board could conduct the necessary readings and vote on it before the compliance monitoring. (Complaint at ¶ 264).

On June 1, 2012, Dr. Wolosky's request to review the personnel file of her "subordinate," McTighe, for purposes of ensuring compliance with state law and the safety of the children entrusted to her care, was denied by Dr. Kasunich without explanation. (Complaint at ¶ 267).

On May 3, 2012, Dr. Wolosky filed a dual charge with the Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania Human Relations Commission (PHRC). (Complaint at ¶ 249). The EEOC issued a letter of Dismissal and Notice of Right to Sue dated March 21, 2014, entitling Wolosky to file this case.

Dr. Wolosky then filed an eight-count Federal Complaint alleging that the actions of the Defendants constitute discrimination based on gender and age. The following claims are asserted against the Trinity Area School District: discrimination under Title VII of the Civil Rights Act of 1964 (Title VII), the Age Discrimination in Employment Act (ADEA), and the Pennsylvania Human Relations Act (PHRA), all as amended; and retaliation under Title VII and the PHRA (Counts I - VI, and VIII). Wolosky further asserts a retaliation claim and a claim for aiding and abetting discrimination under the PHRA against Dr. Kasunich: (Counts VII and VIII). Finally, Dr. Wolosky asserts a claim for aiding and abetting discrimination under the PHRA against McTighe. (Count VII).

Dr. Wolosky specifically alleges that the Trinity Area School District, by and through then Superintendent Paul Kasunich, denied her a raise she had earned in 2011, subjected to a

pattern of discriminatory and retaliatory abuse, ridicule, insult, and surveillance which created a hostile work environment, and gave her a formal Unsatisfactory performance rating and denied a raise in 2012, which forced to use sick leave and take a sabbatical. (See generally, Complaint at ¶ 1). Plaintiff alleges that McTighe and Kasunich, as private individuals, intentionally acted in concert with Trinity. (Complaint at ¶ 319). Plaintiff alleges that Kasunich, also as a private individual, denied her equal treatment in her terms and conditions, rights and privileges of employment, after and because she complained of disparate treatment, which she believed in good faith violated the PHRA. (Complaint at ¶ 323).

For the reasons stated more fully below, Dr. Wolosky is unable to state claims for which relief can be granted against the Defendants. Specifically, Defendants move to dismiss the claim against McTighe for aiding and abetting discrimination under the PHRA, the associated strict employer liability claims under Title VII and the PHRA against the TASD that arise out of the actions of McTighe, and the aiding and abetting claim under the PHRA against Dr. Kasunich for actions allegedly shared with McTighe, pursuant to Fed.R.Civ.P. 12(b)(6).

## II.     STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) states that a complaint may be dismissed for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). In order to survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Iqbal*, 129 S.Ct. at 1949 (quoting *Twombly*, 550 U.S. at 570). In *Iqbal*, the Supreme Court outlined a two-part analysis that district courts must conduct when reviewing a complaint challenged under 12(b)(6). *See Flower v. UPMC Shadyside*, 578 F.3d 203, 210–211 (3d Cir. 2009).

In *Fowler*, this Court held that, following *Iqbal*, motions to dismiss for failure to state a claim in civil cases should be subject to a two-part analysis.[6] *Fowler*, 578 F.3d at 210–211. First, the court should separate the factual and legal elements of a claim; it must accept any well-pleaded facts as true, but may disregard any legal conclusions. *Id*. Second, the court must determine whether the well-pleaded facts are sufficient to show that the plaintiff has a "plausible claim for relief." *Id.* at 211. "In other words, a complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to 'show' such an entitlement with its facts." *Id*. If the well-pleaded facts do no more than permit the court to infer the mere possibility of misconduct, the complaint has not "shown" that the pleader is entitled to relief.[7] *Id*.

The Court recognized in *Fowler* that both *Twombly* and *Iqbal* specifically repudiated the earlier standard of *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), which permitted dismissal of a complaint for failure to state a claim only if "it appear[ed] beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Fowler*, 578 F.3d at 210. A complaint must do more than allege the plaintiff's entitlement to relief, but instead must "show" such entitlement with its facts in order to survive a motion to dismiss. *Id.* Therefore, "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the court to draw on its judicial experience and common sense." *McTernan v. City of York*, 577 F.3d 521, 530 (3d Cir. 2009) (quoting *Iqbal*, 129 S.Ct. at 1950).

In *Wilkerson v. New Media Technology Charter School, Inc.*, 522 F.3d 315 (3d Cir. 2008), the Court made it clear that the paradigm announced in *Twombly* applies with equal force

---

[6] In *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 (3d Cir. 2011), c*ert. denied*, 132 S. Ct. 1861 (2012), the Court added the step of first identifying the elements of the plaintiff's cause of action.
[7] *Twombly* and *Iqbal* are not satisfied by the presence of *any* factual allegations, but only by factual allegations sufficient to support a plausible, rather than simply conceivable, claim.

to analyzing the adequacy of claims of employment discrimination. *Wilkerson*, 522 F.3d at 322. Finally, although this Court must accept all well pleaded facts in the complaint as true, legal conclusions are not "entitled to the assumption of truth." *Iqbal*, 129 S. Ct. at 1950 (citation omitted).

### III. ARGUMENT

**The PHRA Aiding and Abetting Retaliation Claim against McTighe, as well as Claims Arising from McTighe's Non-Supervisory Actions must be Dismissed for Failure to State Claims for which Relief can be Granted**

The Plaintiff alleges that McTighe violated the PHRA, which governs conduct between an employer and its employees. 43 P.S. § 955. The PHRA provides that it is unlawful discriminatory practice:

> (a) For any *employer* because of race, color, religious creed, ancestry, age, sex, national origin or non-job related handicap or disability or the use of a guide or support animal because of blindness, deafness or physical handicap of any individual or independent contractor, to refuse to hire or employ or contract with, or to bar or to discharge from employment such individual or independent contractor, or to otherwise discriminate against such individual or independent contractor, with respect to compensation, hire, tenure, terms, conditions or privileges of employment or contract, if the individual or independent contractor is best able and most competent to perform the services required.

The PHRA also forbids "any person . . . to aid, abet, incite, compel, or coerce the doing of any . . . unlawful discriminatory practice . . . or to attempt, directly or indirectly, to commit any . . . unlawful discriminatory practice." 43 Pa. Stat. Ann. § 955(e). Under the aiding and abetting provision of the statute: "A PHRA plaintiff may advance ... liability claims against [persons] who bear responsibility for implementing an allegedly unlawful discriminatory practice." *D'Altilio v. Dover Twp.*, 2009 WL 2948524, at *12 (M.D. Pa. Sept. 14, 2009). *See also Carlton v. City of Phila.*, 2004 WL 633279 (E.D.Pa. Mar. 30, 2004) (stating that supervisory employees can be held liable as an aider and abettor based upon "the theory that ... [they] share

the discriminatory purposes and intent of the employer."). Furthermore, a supervisor may be liable under § 955(e) either because of his own discriminatory conduct, or for "refusing to take prompt and remedial action against any discrimination suffered by" an employee. *See Dici v. Pennsylvania*, 91 F.3d 542, 552–553 (3d Cir. 1996).

The factual allegations in the Complaint do not assert that McTighe exercised control over the Plaintiff in a supervisory manner. Therefore, under the preceding case law, McTighe cannot be considered Plaintiff's "employer" for purposes of a PHRA claim for aiding and abating discrimination. McTighe was merely a five (5) month contract employee of TASD. (Complaint at ¶ 151). "Only supervisory employees, not co-workers, may be held liable under § 955(e), on the theory that only the former can share the discriminatory purpose and intent of the employer that is required for aiding and abetting." *Carlton*, 2004 WL 633279, at *8 (citing *Bacone v. Philadelphia Housing Auth.*, 2001 WL 748177, *2 (E.D.Pa. June 27, 2001)). *See also Dici v. Com. of Pa.*, 91 F.3d 542, 553 (3d Cir. 1996) (quoting *Tyson v. CIGNA Corp.*, 918 F.Supp. 836, 841 (D.N.J. 1996) (recognizing that under a nearly identical provision in New Jersey, even "a non-supervisory employee who engages in discriminatory conduct cannot be said to 'intend' that his employer fail to respond [to a discriminatory atmosphere].")). To the extent McTighe was Dr. Wolosky's subordinate at most (*see* Complaint at ¶ 267), and co-equal at least, it is certainly clear from the Complaint that McTighe was never Dr. Wolosky's supervisor.[8] The Complaint is void of any allegations regarding McTighe controlling or supervising Dr. Wolosky, who was at all times the Director of the Department of Special Education.

---

[8] Plaintiff's facts lead to the opposite conclusion. For example, Dr. Wolosky interviewed McTighe for her position on December 7, 2011. (Complaint at ¶ 139). Despite the fact that Dr. Kasunich overrode her judgment at times, Dr. Wolosky approved or disapproved McTighe's days off. (*See* Complaint at ¶¶ 238, 243, 250). Finally, while McTighe was insubordinate and/or incompetent according to Dr. Wolosky's, Dr. Wolosky instructed and gave McTighe work orders. (*See* Complaint at ¶¶ 216; 229).

Therefore, accepting as true the allegations in the Complaint, Dr. Wolosky's assertions against McTighe do not articulate a claim under the aiding and abetting theory of the PHRA. Consequently, Dr. Wolosky's claim against McTighe must fail as a matter of law. Furthermore, any associated claims against the Trinity Area School District[9] and Defendant Dr. Paul Kasunich[10] must also fail.

## VI.   CONCLUSION

For the reasons set forth above, the Defendants respectfully request that this Honorable Court find that Dr. Wolosky has failed to state claims for which relief can be granted against the Defendants. Accordingly, Dr. Wolosky's claims against McTighe, and all associated claims against Dr. Kasunich and the Trinity Area School District, must be dismissed.

Respectfully submitted,

ANDREWS & PRICE LLC

By:   /s/ John W. Smart
   John W. Smart, Esq.
   PA I.D. No. 43592
   Firm No. 549
   1500 Ardmore Boulevard, Suite 506
   Pittsburgh, PA  15221
   (412) 243-9700

   Attorney for the Defendants

---

[9] To the extent this Court deems Plaintiff has sufficiently alleged strict employer liability, no such liability attaches to the TASD, because McTighe was not Dr. Wolosky's supervisor. McTighe was Dr. Wolosky's subordinate at most and co-worker at least. *See Cacciola v. Work N Gear*, 2014 WL 2217810, at *7 (E.D.Pa. 2014) ("an employer may be vicariously liable for an employee's unlawful harassment only when the employer has empowered that employee to take tangible employment actions against the victim, i.e., to effect a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.") (quoting *Vance v. Ball State Univ.*, ___ U.S. ___, 133 S.Ct. 2434, 2443 (2013)).

[10] To the extent this Court deems Plaintiff to have sufficiently alleged aiding and abetting liability for those actions Dr. Kasunich allegedly shared with McTighe, the same must fail. Like a conspiracy, if McTighe is not liable for aiding and abetting discrimination there can be no shared unity of purpose, intent to achieve a common illegal goal, and an agreement to work toward that goal with Dr. Kasunich. C.f. *U.S. v. Boria*, 592 F.3d 476, 481 (3d Cir. 2010) (criminal case) ("the mental state requirement for aiding and abetting is identical to that required for conspiracy").

## CERTIFICATE OF SERVICE

    I hereby certify that on October 14, 2014, the foregoing was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic case filing system and constitutes service of this filing under Rule 5(b)(2)(E) of the Federal Rules of Civil Procedure. Parties may access this filing through the Court's ECF system.

                  /s/ John W. Smart
                  John W. Smart, Esq.